

# IN THE
# TENTH COURT OF APPEALS

### No. 10-13-00038-CR
### No. 10-13-00039-CR

**CHAD ROBERT MCFADDEN,**

                                        **Appellant**

 **v.**

**THE STATE OF TEXAS,**

                                        **Appellee**

### From the 272nd District Court
### Brazos County, Texas
### Trial Court Nos. 10-01424-CRF-272 and 12-04175-CRF-272

## MEMORANDUM OPINION

In October 2010, Appellant Chad McFadden pleaded guilty pursuant to a plea agreement to taking wildlife resources without consent of the landowner. *See* TEX. PARKS & WILD. CODE ANN. § 61.022 (West Supp. 2013). The trial court deferred an adjudication of guilt and placed McFadden on community supervision for two years.

In August 2012, McFadden was charged by indictment with the offense of continuous violence against the family. *See* TEX. PENAL CODE ANN. § 25.11 (West 2011). The State subsequently filed an "Amended Motion to Proceed with Adjudication of

Guilt and Sentence" on the taking-wildlife-resources offense, alleging McFadden violated the terms and conditions of his community supervision. By agreement of the parties, the motion to proceed on the taking-wildlife-resources offense and the jury trial on the continuous-family-violence offense proceeded at the same time, with testimony relating solely to the motion to proceed being held outside the jury's presence.

The jury found McFadden guilty of continuous family violence and assessed his punishment at eight years' confinement. The trial court sentenced McFadden accordingly. The trial court then held a punishment hearing on the motion to proceed on the taking-wildlife-resources offense. The trial court ultimately found the allegations in the motion to proceed to be true, adjudicated McFadden guilty, and sentenced him to two years' confinement in state jail, to run consecutively with the sentence in the continuous-family-violence case. These appeals ensued.

**Victim Impact Statements**

In his sole issue in the appeal of the taking-wildlife-resources case (No. 10-13-00038-CR), McFadden contends that the trial court committed reversible error by allowing improper victim impact statements. McFadden specifically argues that the victim impact statements violated article 42.03, section 1(b) of the Code of Criminal Procedure in the following ways: (1) "[a victim impact statement] was given by individuals [sic] not allowed by the statute to give one"; (2) "[t]he improper [victim impact statements] were given before the punishment hearing was *convened* in the [motion to proceed] case"; (3) "[t]he improper [victim impact statements] were given before punishment was pronounced in both the new and old cases"; and (4) "[t]he Trial

Court received a 'response' by [McFadden], not directed by him as a part of the punishment phase of the [motion to proceed], but responding directly to the improper [victim impact statements]."

Generally, for a complaint to be preserved for appeal, the record must show that the appellant made a timely request, objection, or motion and that the trial court ruled on the request, objection, or motion. TEX. R. APP. P. 33.1(a). Even complaints about constitutional errors may be forfeited by failure to raise the issues to the trial court. *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995). Moreover, when an appellant creates the impression that he is abandoning his objection, it is ineffective to preserve the issue for appeal. *Ramos v. State*, 819 S.W.2d 939, 942 (Tex. App.—Corpus Christi 1991, pet. ref'd); *see Purtell v. State*, 761 S.W.2d 360, 366 (Tex. Crim. App. 1988).

Here, after the trial court sentenced McFadden in the continuous-family-violence case, but before it held the punishment hearing in the motion to proceed on the taking-wildlife-resources case, the following occurred:

> THE COURT: ….
> Victim impacts?
>
> [Prosecutor]: Yes, Your Honor.
>
> [Defense Counsel]: Judge, would it be proper for you to punish him before the victim impact?
>
> THE COURT: I already have punished him.
>
> [Defense Counsel]: Well, as to the MTP?
>
> THE COURT: We'll do the MTP in just a minute.
>
> [Defense Counsel]: Okay. Yes, sir.

THE COURT:  Come on up.
Go right ahead.

(Victim impact statements made off the record.)

THE COURT:  All right.  We'll now open the punishment phase of the Motion to Proceed.

Because McFadden did not object to the victim impact statements and pursue his objection to an adverse ruling, his complaint that the trial court committed reversible error by allowing improper victim impact statements is not preserved for appellate review.  *See* TEX. R. APP. P. 33.1(a).  We overrule McFadden's sole issue in the appeal of the taking-wildlife-resources case (No. 10-13-00038-CR).

**Motion for Mistrial**

In his first issue in the appeal of the continuous-family-violence case (No. 10-13-00039-CR), McFadden contends that the trial court committed reversible error when it overruled his motion for mistrial resulting from alleged victim A.C.'s testimony that he had been incarcerated in a state-jail facility.

We review a trial court's ruling on a motion for mistrial for an abuse of discretion.  *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004); *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004).  An appellate court must uphold the trial court's ruling if it was within the zone of reasonable disagreement.  *Wead*, 129 S.W.3d at 129.  A mistrial is required only in extreme circumstances where the prejudice is incurable.  *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007).  A mistrial is the trial court's remedy for improper conduct that is so prejudicial that expenditure of

further time and expense would be wasteful and futile. *Hawkins*, 135 S.W.3d at 77.

The exchange in question was as follows:

Q. [By Prosecutor]   At some point did you and the defendant start hav[ing] a dating relationship?

A.     Yes.

Q.     When did that happen?

A.     That probably started around June 2011.

Q.     And during that time, were y'all consistent or would you break up and get back together?

A.     There was [sic] a few breakups in between it.

Q.     When was that?

A.     When he was in state jail.

[Defense Counsel]:  Objection, Your Honor.

[Prosecutor]:  Your Honor, can we approach?

THE COURT:   Step into the jury room, ladies and gentlemen.

(The jury leaves the courtroom.)

[Prosecutor]:  Judge, can we have the witness wait outside?

….

THE COURT:  Step out in the hallway, young lady, if you don't mind, and wait on us.

(The witness leaves the courtroom.)

(At the bench, on the record.)

[Prosecutor]:  Judge, I didn't intend for that.  I was talking

about dates about when they were getting together.

[Defense Counsel]: About when they were not together.

[Prosecutor]: It wasn't intentional ….

THE COURT: She said "state jail"; is that right?

[Defense Counsel]: Yes.

[Prosecutor]: Judge, I was intending for like dates of when they were breaking up.

THE COURT: I don't think you intended it. She just rolled that in on us, I'm afraid.

[Defense Counsel]: Judge, I ask for a mistrial.

THE COURT: Is that eventually going to come out anyway?

[Defense Counsel]: I'm trying like hell to keep it out.

….

[Prosecutor]: Judge, I would ask you to have an instruction to disregard.

[Defense Counsel]: Judge, that's impossible to disregard that. I mean, all of them sit around and talk to during voir dire about what if he got priors, if he got a prior.

….

[Prosecutor]: Judge, I don't know if it's going to come in he's been to state jail or not. It's possible it could be raised, but I think an instruction to disregard would cure any error.

[Defense Counsel]: Judge, you can't disregard that.

THE COURT: How about some case law on this? I think we're going to need to look up some stuff on this.

[Prosecutor #2]: You want to give the jury a break for a

while, Judge?

THE COURT:  Yeah.  How long do you think we need to give them?  How long do you think we need to give them?

[Prosecutor #2]:  Thirty minutes.

[Defense Counsel]:  I guess.

THE COURT:  Thirty minutes.  Tell them we're not going to be back with them for 30 minutes.  They can walk around, whatever they want to do.  Be back in 30 minutes.

(Break from 9:32 AM to 9:50 AM.)

….

(Recess taken from 10:01 AM to 10:20 AM)

….

THE COURT:  All right.  Here's what I'm going to do.  I'm going to sustain your objection.  I'm going to give the jury an instruction to disregard, and I'm going to take your motion for mistrial under advisement.  And I may grant it at the end of the evidence, if looking back -- I may or may not grant it depending on how the evidence develops in the case.  For now, it will be denied.

….

(Break had from 10:31 AM to 10:34 AM.)

….

(The jury enters the courtroom.)

THE COURT:  Be seated.
All right, ladies and gentlemen, I have an instruction for you at this time.  You are hereby instructed to disregard the last answer of the witness.  Strike it from your mind and do not consider it in your deliberations for any purpose.

Testimony that refers to or implies extraneous offenses can be rendered harmless

by an instruction to disregard by the trial court, unless the evidence was so clearly calculated to inflame the minds of the jury or is of such damning character as to suggest it would be impossible to remove the harmful impression from the jury's mind. *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992); *Harris v. State*, 164 S.W.3d 775, 783 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). McFadden argues that while A.C.'s statement may not have been intentionally elicited by the prosecutor, A.C. intentionally made the statement that McFadden had been "in state jail." But even if A.C.'s statement was intentional, it was not embellished in any manner. The uninvited and unembellished reference to McFadden's incarceration was therefore not so inflammatory as to undermine the efficacy of the trial court's instruction to disregard. *See Kemp*, 846 S.W.2d at 308 (holding witness's testimony, "this caller also provided information that she had a son … who had recently been released from the penitentiary," was not so inflammatory as to undermine efficacy of trial court's instruction to disregard); *Harris*, 164 S.W.3d at 783 (holding witness's testimony, "Since the last time [appellant] got out of jail. Like he got out in 2000," was not so inflammatory as to undermine efficacy of trial court's instruction to disregard). Furthermore, although a little over an hour elapsed between A.C.'s statement and the instruction to disregard, the trial court gave the instruction to disregard immediately when the jury returned and was careful not to refresh or reinforce the jury's memory of the content of the statement.

The trial court did not abuse its discretion in denying McFadden's motion for mistrial. We overrule McFadden's first issue in the appeal of the continuous-family-

violence case (No. 10-13-00039-CR).

## Opening the Door

In his second issue in the appeal of the continuous-family-violence case (No. 10-13-00039-CR), McFadden contends that the trial court committed reversible error when it concluded that his trial counsel "opened the door" to extraneous offenses during his trial counsel's initial cross-examination of Fort Worth Police Officer Mitchell Ellis.

Under Rule 404(b), evidence of other crimes, wrongs, or acts is inadmissible "to prove the character of a person in order to show action in conformity therewith." TEX. R. EVID. 404(b). Rule 404(b) also provides, however, that the evidence may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.* When the accused claims self-defense, the State, to show the accused's intent, may therefore introduce evidence of other violent acts where the defendant was an aggressor. *Halliburton v. State*, 528 S.W.2d 216, 219 (Tex. Crim. App. 1975) (op. on reh'g); *Jones v. State*, 241 S.W.3d 666, 669 (Tex. App.—Texarkana 2007, no pet.). We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005).

McFadden's defense counsel cross-examined Officer Ellis as follows:

> Q.     Now, I want to be real clear. You are stating that those pictures that were shown -- I think one time there was an interchange that said that those pictures consistent with the victim, and I think one time it's said those pictures were consistent with someone being struck. I mean, you can't tell a victim from, what, just by looking at a picture, can you?
>
> A.     No.

Q. That's just consistent with someone being struck?

A. Correct.

....

Q. Now, do you put great weight on who calls 911 first?

A. I took it into consideration. The fact that he didn't call 911, he didn't -- he didn't go to the emergency room, he was still -- he had just gotten in his truck and remained in the area the whole time.

Q. But he did leave the situation?

A. Correct.

Q. And eventually he did go to the emergency room, right?

A. Yes.

Q. You called an ambulance there and he was transported, right?

A. Right. Mr. McFadden requested that I call an ambulance. And after I removed him from his truck, I then notified dispatch to have an ambulance come to [the] scene.

Q. And you accompanied him to the --

A. Yes.

Q. So you were there the whole time he was in the hospital?

A. I wasn't there the whole time. I had to go to the jail to finish paperwork, so I had another unit relieve me while he was at the hospital.

Q. And to make an arrest, I guess, the level of proof or amount of evidence, you just have to have probable cause, correct?

A. Correct.

Q. And were there -- I mean, you took pictures of [A.C.], but

there were also pictures taken of Mr. McFadden?

      A.     Yes, sir.

After Officer Ellis testified, the State rested its case. The following exchange then occurred outside the presence of the jury:

> [Prosecutor]: Judge, I think [Defense Counsel] has clearly opened the door to the extraneous offenses by questioning him about the defensive injuries, having to call an ambulance, having to go to the hospital. You opened the door and raised self-defense, and we get to --

> [Defense Counsel]: I have not raised self-defense in any way, shape, or form.

> [Prosecutor]: Yes, you did by mentioning -- that's what this case law says. We were careful in how we did it.

> [Defense Counsel]: I was more than careful …. I'm not going to lay over for that. I did not do any of that.

The trial court eventually decided to hold a hearing on the issue after which it ruled that defense counsel's "questions concerning the emergency ambulance, taking to the hospital, taking pictures of him opens self-defense."

McFadden would have us focus only on the foregoing in deciding this issue. But despite the trial court's ruling, the discussion continued:

> [Prosecutor]: Judge, I have Mike Watson on the way….

> ….

> [Defense Counsel]: Watson is about extraneous stuff, Judge. This is their ambush deal, to set all these witnesses up, just bring them all in here and talk about how horrible he is.

> THE COURT: Unfortunately, that's the law.

> [Defense Counsel]: Well, no -- well, we have to have a

hearing about the relevance of all these things.  It doesn't automatically open the door up.

[Prosecutor #2]:  I thought that's what we were doing now, Judge.

THE COURT:  We are going to have the hearing, if we need to have another hearing.  But then after the hearing, can we put the witness on if I rule against you?  Do you have a problem with that?

[Defense Counsel]:  Of them re-opening their case?

THE COURT:  Okay, yeah, do you have a problem with them re-opening their case?

[Defense Counsel]:  Yes, sir.

THE COURT:  Let's go ahead and get her on the stand, and we'll rule on all that other later.

McFadden then presented his case-in-chief.  During his case-in-chief, McFadden questioned A.C. about injuries she may have given to him during an altercation.  He asked if A.C. had bitten McFadden on the knee and if she had grabbed his testicles; A.C. replied that she had.  In response to McFadden's questioning, A.C. denied biting his arm but said that she possibly could have scratched his stomach in the struggle.  McFadden also asked A.C. if there were any instances when she called a friend to come over to calm her down.  A.C. said that she did not recall any such times.  McFadden also asked Officer Ellis about McFadden's injuries during his case-in-chief.  In response to McFadden's questioning, Officer Ellis testified that McFadden had a bite mark on his arm, scratches on his chest, bruising on his knees, a cut to his foot, and pain in his scrotum.

McFadden then called Daniel Ostertag to testify.  Ostertag testified that he heard

"rambling around in the room" and McFadden say, "[A.C.], get off me.  Leave me alone."  Ostertag said that when they came out of the bedroom, he saw A.C. rush at McFadden.  As McFadden then tried to leave the apartment, A.C. ran after him and sat down and held herself against one of his legs.  Ostertag again heard McFadden saying, "[A.C.], get off me."

When McFadden concluded his case-in-chief, the trial court asked his defense counsel if he was going to rest.  McFadden's defense counsel replied, "Yes, sir.  And I guess before they start rebutting with anything has to do with extraneous, I would like a hearing about all that."  The trial court then held another hearing on the issue.  During the hearing, the following exchange took place:

> [Defense Counsel]:  I understand the State's position that if a defensive theory is raised, which back when the Court said it was raised, we had a little bit of an argument about that.

> THE COURT:  Well, we're having the same argument now.

> [Defense Counsel]:  Yes, I guess we're just carrying it along. Perpetual argument.
> See it's that time, Judge.  After that then that's when the State brought in the deal with self-defense.  I mean, that's when they introduced, I guess, kind of just saying I opened the door to it or barely raised it.  They just slammed it in.

> THE COURT:  Well, you brought in, as I recall, that he was injured and an ambulance was called and he was taken to the hospital by the ambulance and the officer took some pictures of him.

> [Defense Counsel]:  Then the State -- [Prosecutor #2] brought --

> THE COURT:  That's pretty strong evidence of injury right there.

McFadden v. State                                                                                           Page 13

[Defense Counsel]:  Well, I agree.  *Let's just say the defensive theory has been raised.*

Now, past that point, after that, I mean, I haven't -- that was, I believe, [Prosecutor #2] that kept saying to Daniel, "She was the aggressor?"  I never used that term.  I said, "So what did you seen then?"  "I saw her run out and then they collided."  And [Prosecutor #2]'s statement was "bull rushed."  That was not anything I brought up.

But other than that, I mean, with [A.C.] on the stand, I never questioned her about her being the initial aggressor.  "Did you ever hit him first?"

What I'm saying, *I agree that it's raised*, but there's different levels of raising it, I guess.  You can just totally overwhelm the State's case with it.  Or it's barely been raised.

That's something the Court needs to take into consideration.  It doesn't automatically come in.  There's still probative versus prejudiced argument to be made.  That's, I guess, what I would like some articulation from the State of how it is -- I mean, they're the proponent of it -- how it is more probative.

[Emphasis added.]  The hearing continued with a discussion about the probative versus prejudicial value of allowing the extraneous-offense evidence.  The trial court ultimately ruled, "All right.  I'm going to let it in."  The extraneous-offense evidence was then presented during the State's rebuttal.

McFadden failed to preserve this issue for appellate review because he created the impression that he was abandoning any objection that he opened the door to extraneous offenses by raising self-defense as a defensive theory.  *See Purtell*, 761 S.W.2d at 366.  When the trial court revisited the issue after McFadden's case-in-chief and before the extraneous-offense evidence was presented, McFadden's trial counsel stated that he agreed that the self-defense defensive theory had been raised.  His objection at that time was that the probative value of the extraneous-offense evidence was outweighed by its prejudicial effect.  *See* TEX. R. EVID. 403.  McFadden has not raised

that issue on appeal. Nevertheless, even if McFadden's issue was preserved, we conclude, in light of the evidence presented, that the trial court did not abuse its discretion in admitting the extraneous-offense evidence to rebut his theory that A.C. was the aggressor. *See Halliburton*, 528 S.W.2d at 219; *Jones*, 241 S.W.3d at 669. We overrule McFadden's second issue in the appeal of the continuous-family-violence case (No. 10-13-00039-CR).

We affirm the trial court's judgments in each case.


REX D. DAVIS
Justice

Before Chief Justice Gray,
      Justice Davis, and
      Justice Scoggins
Affirmed
Opinion delivered and filed June 5, 2014
Do not publish
[CR25]